**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| RUBY TAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 03-1761 (RMC) |
| | ) | (Consolidated with Civil No. 05-810) |
| ELAINE L. CHAO, Secretary of Labor, *et* | ) | |
| *al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION**

Can an employer be held liable for sexual harassment when a plaintiff was offended by some mangers' comments but did not complain for months, and when she did complain the employer investigated quickly and the alleged harassment ceased?  The answer is no.  Plaintiff Ruby Taylor[1] brought this action against her employer, the Pension Benefit Guaranty Corporation ("PBGC"), alleging race and gender discrimination due to sexual harassment by managers.  *See* 42 U.S.C. § 2000(e) *et seq*.  PBGC is not liable because Ms. Taylor failed to report the alleged harassment for a substantial period of time.  When she finally did report it, PBGC promptly investigated and there were no further incidents.  Ms. Taylor also alleges retaliation, but this claim lacks merit because the alleged retaliatory actions either (1) were too long after her complaint of discrimination to be causally related; (2) were not materially adverse to cause a reasonable employee to forego filing a discrimination charge; or (3) the employer has presented a non-discriminatory reason for its actions and Ms. Taylor has failed to present evidence of pretext.  Thus, summary judgment will be granted to PBGC.

---

[1] Since this case was filed, Ms. Taylor married and changed her name to Ruby Redd.

## I.  FACTS

Ms. Taylor is an African American woman who is employed currently, and at the times relevant to her complaints, as an auditor by PBGC.  Compl. in Case No. 03-1761 ("1st Compl.") ¶ 4; Compl. in Case No. 05-810 ("2d Compl.") ¶ 4.[2]  She is an auditor with PBGC's Division of Insurance Supervision and Compliance, formerly known as the Pre-Termination Processing Division ("PPD").  2d Compl. ¶ 4.  PPD was divided into two sections, auditors and financial analysts.  Pl.'s Ex. 3, Joy Dep. at 32.  Jonathan Henkel supervised the auditors, including Ms. Taylor.  Pl.'s Ex. 4, Bacon Aff. at 3.  The head of PPD was Robert Joy, Pl.'s Ex. 3, Joy Dep. at 7, and Mr. Joy's supervisor was Bernie Hagans, Director of the Insurance Operations Department.  *Id*. at 67.  Ms. Taylor's supervisors — Mr. Hagans, Mr. Joy, and Mr. Henkel — were all Caucasian men.  Ms. Taylor was a "very good employee."  *Id*. at 64.

Robert Bacon, an African American, supervised the analysts.  Pl.'s Ex. 4, Bacon Aff. at 3.  Ms. Taylor alleges that she was sexually harassed by Mr. Bacon in a work atmosphere that was "permeated with sexual discussion and innuendo."  Pl.'s Opp. at 3.  She contends that the  the supervisors "fed into" the atmosphere, that PPD head Mr. Joy called her "sweetie" and stared at her.  Pl.'s Ex. 7, Taylor 2007 Dep. at 8 & 12.  She also claims that once when she asked him a work-related question, he flirtatiously responded that he would do anything she wanted.  *Id*. at 8.  In addition, on more than one occasion, Mr. Hagans complimented Ms. Taylor on her appearance.  Pl.'s Ex. 9, Hagans Dep. at 59-60.

Ms. Taylor further complains that a team building exercise that took place in Rock Creek Park in the summer of 2001 became "sexually charged."  Pl.'s Opp. at 5.  Employees formed

---

[2] The Court consolidated the 2003 and 2005 cases in an order entered on November 2, 2005.

two teams for a scavenger hunt for items on a list Mr. Henkel created.  Pl.'s Ex. 14, Henkel Dep. at

47 & 52.  The list included "plastic toy (adult)" and "4 strands of hair."  Pl.'s Ex. 15.  Ms. Taylor

produced a strand of her red hair for her team.  Pl.'s Ex. 12, Logan Dep. at 72-74.  Another auditor on

her team, Michael Logan, then asked Ms. Taylor whether her hair was "red all over" and people

laughed.  *Id*. at 74.  Mr. Bacon and Mr. Henkel gave Ms. Taylor's team 150 points due to the

"embarrassing moment."  Pl.'s Ex. 14, Henkel Dep. at 120.

Specifically with regard to Mr. Bacon, she alleges that he harassed her from some time

in 2001 until April of 2002.[3]  Pl's Opp. at 7-14.  First, Mr. Bacon began to tell Ms. Taylor that he

wanted to be her "close friend."  Pl.'s Ex. 6, Taylor 2005 Dep. (Day 2) at 20.  Mr. Bacon told Mr. Joy

that Ms. Taylor "would do anything to move ahead."  *Id*.  In October of 2001, Mr. Bacon assured Ms.

Taylor that he would make sure she received an outstanding performance evaluation.  Pl.'s Ex. 2,

Taylor First Aff. at 7.  When Ms. Taylor then did received outstanding evaluation, Mr. Bacon asked,

"what are you going to do for me?"  Pl.'s Ex. 2, Taylor First Aff. at 10.

Mr. Bacon allegedly made other comments as well.  In 2001, Mr. Bacon told Ms.

Taylor that she did not love her fiancé because if she did, she already would have married him.  Def.'s

Ex. 11, First EEO Compl. Att.  at 1-2.  Mr. Bacon told Ms. Taylor that he could beat up her fiancé.

*Id*. at 2.  Also sometime in 2001, Mr. Bacon flirted with Ms. Taylor and she asked him to stop.  *Id*.

When she told him to stop sexually harassing her, Mr. Bacon told her that no one would believe her

and that they would think she was coming on to him.  *Id*.  Mr. Bacon allegedly bragged that he did not

need to pursue  women because they flocked to him, and that despite this, he had never cheated on his

---

[3] Before this time, Ms. Taylor and Mr. Bacon exercised together, regularly going running, sometimes just the two of them and sometimes with another auditor, Toni Montgomery-Chase.  Pl.'s Opp. at 7.  Ms. Taylor and Mr. Bacon stopped working out together in the summer of 2001.  *Id*. at 8.

wife.  *Id*. at 3-6.

In April of 2002, Ms. Taylor asserts that she had a number of confrontations with Mr.

Bacon resulting in her complaint to PBGC's  Human Resources Department ("HRD").  On April 3 of

2002, Ms. Taylor was wearing a suit jacket with a short-sleeved blouse underneath.  *Id*. at 5.  She took

off her jacket because she was hot, and Mr. Bacon said, "I see you flaunting that black."  *Id*.  On April

4, 2002, Mr. Bacon stopped by Ms. Taylor's office.  *Id*.  She refused to turn around to say hello, since

she was busy working and had already said hello to him that day.  She felt that he bullied her by

insisting that she turn around to talk to him.  *Id*.  The next day, Friday April 5, when Ms. Taylor was

in the copy room, Mr. Bacon came in to speak to her.  *Id*. at 6.  She tried to ignore him, but he

followed her around the room calling her "baby" and saying, "You know you see me.  You'd better

turn around."  *Id*.  He approached her with his hands toward her neck as if to choke her.  *Id*.  She told

him not to touch her, and he replied that he would if he wanted to.  *Id*.  She told him to stop harassing

her and that she would complain to management if he continued.  *Id*.  Mr. Bacon responded that

management would not do anything because he was well liked and that she should appreciate the

outstanding evaluation she received.  *Id*.

On April 9, 2002, Ms. Taylor contacted HRD, and she was referred to Janice Mackey,

the Equal Employment Opportunity ("EEO") manager.[4]  Def.'s Ex. 11, First EEO Compl. at 8.  Under

---

[4] Prior to this time Ms. Taylor had not notified her supervisor, Mr. Henkel, or PBGC's HRD about the alleged harassment.  Sometime in the fall of 2001, Ms. Taylor had complained to her friend David Smith, a team leader in the Insurance Operations Division, about Mr. Bacon.  Pl.'s Ex. 18, Smith Aff. at 4-7.  When she complained to him again in April of 2002, he advised her to file a complaint.  Pl.'s Ex. 5, Smith Dep. at 29-30.

PBGC's policy for the prevention of sexual harassment,[5] Ms. Taylor had the option to go to an EEO counselor or to follow the "sexual harassment exception" to the individual complaint procedures under which an employee can request an investigation.  Pl.'s Ex. 21, Mackey Aff. at 3; *see* Def.'s Ex. 18, Policy 30-4.  Ms. Taylor elected to proceed under this exception and requested that PBGC launch an investigation.  *Id*. at 4.  Attorney-Advisor Tim Callaghan of the Office of the General Counsel started investigating on April 12, 2002, and on April 23, Mr. Callaghan issued a Report of Inquiry.  Def.'s Ex. 17, Report of Inquiry.  The Report indicated that Ms. Taylor alleged sexual harassment, Mr. Bacon denied the allegations, and the remaining PBGC personnel interviewed by Mr. Callaghan expressed surprise and disbelief that Mr. Bacon would sexually harass someone.  *Id*. at 2.  There were no witnesses to the alleged incidents of harassment, other than Ms. Taylor and Mr. Bacon.  *Id*.  The Report did not find sufficient evidence that Mr. Bacon had sexually harassed Ms. Taylor and thus no discipline was taken against Mr. Bacon.  Def.'s Ex. 34, Mackey Aff. at 16.

Ms. Taylor contends that after she filed her EEO complaint her supervisors retaliated against her.  Pl.'s Opp. at 15.  Ms. Taylor's performance evaluation was downgraded from "outstanding" in 2001, to "excellent" in 2002, to "fully effective" in 2003.  Pl.'s Ex. 11, Taylor Second Aff. at 6.  In June of 2002, Mr. Hagans told Ms. Taylor that she needed to improve her "negative behaviors."  Pl.'s Ex. 2, Taylor Aff. at 79.  Ms. Taylor also alleges that her supervisors started withholding work, Pl.'s Opp at 18, and that in fall of 2003 she was required to submit work plans to her supervisor twice per month instead of once per month as she had previously done.  Pl.'s Ex. 7, Taylor 2007 Dep. at 67; Def.'s Ex. 32, Second EEO Compl.  In early 2004, Mr. Joy told another

---

[5] PBGC is subject to Directive 30-4, which includes a policy for the prevention of sexual harassment.  Def.'s Ex. 18.  Ms. Taylor was aware of the policy.  Pl.'s Ex. 7, Taylor 2007 Dep. at 19, 21.

supervisor, Michelle Gray, that he would not recommend Ms. Taylor for a position that PBGC might create because he did not trust her.  Pl.'s Ex. 3, Joy Dep. at 82-83.  The position was never created. *Id*. at 84.

Ms. Taylor also claims that she was improperly charged absent without leave ("AWOL") in October of 2003, when she in fact had submitted a leave slip.  *Id*. at 97.  Later, PBGC rescinded the AWOL charge, and Ms. Taylor was paid for her time off.  *Id*. at 104.

Ms. Taylor sought EEO counseling on May 7, 2002 and filed an EEO complaint  on August 28, 2002, concerning the 2001 and 2002 behaviors summarized above.  *See* Def.'s Ex. 11.  On August 19, 2003, she filed suit against PBGC[6] alleging race and gender discrimination, harassment, and retaliation.  *See* Civil Case No. 03-1761.  On October 17, 2003, she sought EEO counseling based on her claims of further retaliation.  She then filed another EEO complaint on February 5, 2004, *see* Def.'s Ex. 32, and another court complaint on April 22, 2005, alleging continuing discrimination, harassment, and retaliation.  *See* Civil Case No. 05-810.  The cases were consolidated, and now PBGC has moved for summary judgment.  The matter is ripe and ready for decision.

## II.  SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty*

---

[6] Named defendants are (1) the Secretary of Labor, Elaine Chao, in her official capacity as Chairman of the PBGC and (2) the Executive Director of PBGC.  Currently, PBGC is headed by Interim Director is Charles Millard.  Either the Chairman or the Director or both acting together is head of the PBGC.  2d Compl. ¶ 5.  Defendants are named in their official capacities only.  *Id*.

*Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III. ANALYSIS

### A.  Discrimination Based on Allegations of Hostile Work Environment

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating on the basis of race, color, religion, sex, or national origin in hiring decisions, in compensation, terms and conditions of employment, and in classifying employees in a way that would adversely affect their status as employees. 42 U.S.C. § 2000e-16. The Supreme Court has determined that the language of Title VII "is not limited to economic or tangible discrimination. The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate

treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB   v. Vinson*, 477 U.S. 57, 64 (1986)) (internal quotation marks omitted).   Therefore, Title VII is violated when a plaintiff demonstrates that the "workplace is permeated with discriminatory intimidation, ridicule, and insult" and that this behavior is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 21.

An employer can be shielded from liability on a claim of harassment if it establishes (1) the employer exercised reasonable care to prevent and correct promptly any harassing behavior and (2) the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise. *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 724, 765 (1998); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Roebuck v. Washington*, 408 F.3d 790, 794-95 (D.C. Cir. 2005).[7]

PBGC has established an affirmative defense in this case.   PBGC maintains a policy of equal employment opportunity and against sexual harassment.   Def.'s Ex. 18.   The policy is available on PBGC's internet website, and it directs employees who believe they have been harassed to contact an EEO counselor or the EEO manager immediately.   *Id*.   On October 2, 2001, PBGC's Chief Management Officer repeated this policy in an e-mail to all PBGC employees.   *See* Def.'s Ex. 21.   ("you . . . must contact an EEO Counselor within 45 days of the conduct that is believed to be harassing").   Ms. Taylor was aware of the anti-harassment policy.   Pl.'s Ex. 7, Taylor 2007 Dep. at 19,

---

[7] This affirmative defense does not apply in cases where the harassment culminates in a tangible adverse employment action such as discharge or demotion. *Faragher*, 524 U.S. at 808.

21. Because it has an anti-harassment policy which informs employees where to report allegations of harassment, PBGC has established the first element of an affirmative defense. *See, e.g., Fierro v. Sacks Fifth Ave.*, 13 F. Supp. 2d 481, 491-92 (S.D.N.Y. 1998) (employer's anti-harassment policy establishes first element of defense).

PBGC has also shown that Ms. Taylor unreasonably failed to take advantage of the preventative or corrective opportunities provided by PBGC. Ms. Taylor alleges[8] that Mr. Bacon started harassing her in 2001 when he told her he wanted to be her "close friend," *see* Pl.'s Ex. 6, Taylor 2005 Dep. (Day 2) at 20, and that he would make sure she received an outstanding evaluation. Pl.'s Ex. 2, Taylor First Aff. at 7. It was also in 2001 that Mr. Bacon told Ms. Taylor that she did not love her fiancé because if she did she already would have married him, that he told her he could beat up her fiancé, and that he flirted and bragged that women flocked to him. Def.'s Ex. 11, First EEO Compl. Att. at 1-6. The scavenger hunt in Rock Creek Park where Mr. Logan asked Ms. Taylor whether her hair was "red all over" occurred in the summer of 2001. Nevertheless, Ms. Taylor did not complain to her supervisors or to PBGC's HRD until April 9, 2002. Due to this long delay in reporting the alleged problem, Ms. Taylor failed to take advantage of any preventive or corrective measure that PBGC might have provided. Earlier reporting may have stopped Mr. Bacon from telling Ms. Taylor he thought she was flaunting her bare arms on April 3 of 2002, from insisting that she turn around to talk to him on April 4, and from calling her "baby" on April 5.

When Ms. Taylor finally contacted HRD on April 9, PBGC acted promptly. Attorney-Advisor Tim Callaghan of the Office of the General Counsel started investigating on April 12, 2002,

---

[8] PBGC denies the vast majority of the alleged incidents of harassment. For the purposes of PBGC's motion for summary judgment, however, the Court draws all justifiable inferences in favor of Ms. Taylor and accepts Ms. Taylor's evidence as true. *See Anderson*, 477 U.S. at 255.

and completed his investigation on April 23.  Ms. Taylor has not asserted any additional allegations of sexual harassment by Mr. Bacon or anyone else after the April 2002 investigation.

Ms. Taylor argues that she did not delay (and that PBGC did not act promptly) because she complained to her friend David Smith, a team leader in the Insurance Operations Division, about Mr. Bacon.  Pl.'s Ex. 18, Smith Aff. at 4-7.  While Mr. Smith is a team leader and therefore in management at PBGC, he was not Ms. Taylor's supervisor and he was not an EEO counselor or manager.  Ms. Taylor's informal complaint to Mr. Smith did not constitute notice to PBGC sufficient to bar PBGC's assertion of the affirmative defense.

Even if the Court did not find that the affirmative defense applied, Ms. Taylor's sexual harassment claim must be dismissed because she does not allege conduct sufficiently severe and pervasive to constitute a hostile work environment.  To establish a prima facie hostile work environment claim, a plaintiff must demonstrate (1) that she is a member of a protected class, (2) that she was subject to unwelcome harassment, (3) that the harassment occurred because of her race or gender, (4) that the harassment affected a term, condition, or privilege of employment, and (5) that the employer knew or should have known of the harassment, and failed to act to prevent it.  *Lester v. Natsios*, 290 F. Supp. 2d 11, 22 (D.D.C. 2003) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

In determining whether a hostile work environment claim is substantiated, a court must look at all the circumstances of the plaintiff's employment, specifically focusing on such factors as the frequency of the discriminatory conduct, its severity, whether it was threatening and humiliating or was merely offensive, and whether it unreasonably interfered with the employee's work performance.  *Harris*, 510 U.S. at 23.  The conduct must be sufficiently extreme to constitute an alteration in the

-10-

conditions of employment, so that Title VII does not evolve into a "general civility code." *Faragher*, 524 U.S. at 788. Consequently, "'mere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (quoting *Meritor*, 477 U.S. at 91). Further, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 778. A plaintiff must demonstrate that the alleged events leading to the hostile work environment were connected, since "discrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult." *Lester*, 290 F. Supp. 2d at 33 (citing *AMTRAK v. Morgan*, 536 U.S. 101,115-16 (2002)). "Workplace conduct is not measured in isolation." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001).

For example, in *George v. Leavitt*, 407 F.3d 405 (D.C. Cir. 2005), the D.C. Circuit held that statements by three employees over a six-month period telling a plaintiff to "go back where she came from," separate acts of yelling and hostility, and allegations that the plaintiff was not given the type of work she deserved, were isolated instances that did not rise to the level of severity necessary to find a hostile work environment. *Id*. at 416-17. Similarly, in *Singh v. United States House of Representatives*, 300 F. Supp. 2d 48, 54-57 (D.D.C. 2004), this Court found that a plaintiff's allegations that her employer humiliated her at important meetings, screamed at her in one instance, told her to "shut up and sit down" in one instance, and was "constantly hostile and hypercritical" did not amount to a hostile work environment, even though these actions may have been disrespectful and unfair. *But see Boyd v. Snow*, 335 F. Supp. 2d 28, 34-35 (D.D.C. 2004) (harassment not challenged where plaintiff's supervisor repeatedly made remarks referring to sex acts and genitals, touched his

-11-

private parts in front of plaintiff, and grabbed plaintiff's shoulders and backed her into a wall); *Lucero-*

*Nelson v. Washington Metro. Area Transit Auth.*, 1 F. Supp. 2d 1, 17-18 (harassment presumed where

plaintiff's supervisor asked her questions about her sex life and racial preferences for sex partners,

commented on her appearance and asked other employees to admire her legs, and asked plaintiff if she

was a virgin when she married).

> Here, Ms. Taylor alleges the following incidents of harassment:
>
> (1) The summer 2001 scavenger hunt in Rock Creek Park when Mr. Logan asked if her hair were "red all over";
>
> (2) Mr. Hagans' compliments her on her appearance;
>
> (3) Mr. Joy calling her "sweetie";
>
> (4) Mr. Bacon's comments in 2001 when he said that he wanted to be Ms. Taylor's "close friend," that he would make sure she received an outstanding evaluation, that she did not love her fiancé, that he could beat up her fiancé, and flirted and bragged about his attractiveness to women.
>
> (5) Mr. Bacon's comments in April 2002 when he said that Ms. Taylor flaunted her bare arms when she took off her jacket; insisted that she turn around to talk to him; followed her around the copy room calling her "baby" and insisting that she turn around; and said that she should appreciate the outstanding evaluation she received.

These allegations are insufficiently severe and pervasive to constitute an hostile work environment.

While Ms. Taylor may have been genuinely offended at some of the comments made to her, these are

the type of offhand comments and isolated incidents that simply do not amount to a discriminatory

change in the terms and conditions of employment.  *Faragher*, 524 U.S. at 778.  Title VII is not a

civility code.  *Id*.

### B.  Retaliation

Ms. Taylor also contends that PBGC retaliated against her after she complained of discrimination.  Title VII prohibits an employer from retaliating against an employee because she "has opposed any practice made an unlawful employment practice by this title, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation, a plaintiff must show that: 1) she engaged in protected activity; 2) she suffered from a materially adverse act; and 3) a causal connection exists between the protected activity and the employer's act.  *See Burlington N. & Santa Fe Ry. v. White*, 126 S. Ct. 2405 (2006); *Holcomb v. Powell*, 433 F.3d 889, 901-02 (D.C. Cir. 2006).

Retaliatory acts are not limited "to those that are related to employment or occur at the workplace."  *Burlington*, 126 S. Ct. at 2409 (2006).  However, a plaintiff must show that the employer's actions "would have been materially adverse to a reasonable employee." *Id*.  Further, "an employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id*.  The Supreme Court has emphasized that the employer's action must be "materially" adverse because the statute protects employees from significant harms and does not protect an employee from "those petty slights or minor annoyances that often take place at work and that all employees experience." *Id*. at 2415.  Further, an objective "reasonable person" standard applies. *Id*.  Employees are not protected from "all retaliation, but from retaliation that produces an injury or harm." *Id*. at 2414.  Cases must be evaluated based on their unique circumstances. *Id*.  "A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight.  But to retaliate by excluding an employee from a weekly training lunch

that contributes significantly to the employee's professional development might well deter a reasonable employee from complaining about discrimination." *Id*. at 2415-16.

In order to show causation, a plaintiff must show that the official responsible for the alleged retaliatory act had knowledge of the protected activity. *Mitchell v. Baldridge*, 759 F.2d 80, 86 (D.C. Cir. 1985). A plaintiff may rely on temporal proximity to prove causation, but such proximity must be "very close." *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001). For example, many courts have held that time lags of more than three months are too long to show retaliatory causation. *Breeden*, 532 U.S. at 273-74 (20-month lag; citing with approval *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (3-month lag)); *Sullivan-Obst v. Powell*, 300 F. Supp. 2d 85, 94 (D.D.C. 2004) (3-month lag and 15-month lag).

Ms. Taylor fails to present a prima facie case of retaliation as to certain of her allegations because she has not shown a causal connection between the incidents and the April 2002 complaint of discrimination. The following events occurred more than a year after Ms. Taylor's protected activity: (1) the early 2004 incident where Mr. Joy allegedly told Ms. Gray that he would not recommend Ms. Taylor for position that PBGC might create because he did not trust her; (2) the November 2003 incident where Ms. Taylor was erroneously listed as AWOL; and (3) the period in the fall of 2003 when Ms. Taylor was required to submit work plans to her supervisor twice per month.[9] While the record does not indicate the precise month in 2003 when Ms. Taylor's performance was evaluated as "fully effective," it must have occurred at least eight months (April 2002 to January 2003) after Ms. Taylor's April 2002 complaint of discrimination. This lack of temporal proximity does not

_____

[9] Other employees, Thomas White and James Wright (both white males), were required to submit bi-weekly work plans. Def.'s Ex. 33, Resp. to Interrogatory 11. Ms. Taylor has not submitted evidence that she was singled out for close supervision.

support Ms. Taylor's claim of retaliation, and Ms. Taylor has not presented any other evidence that

there was a causal connection between these actions and her protected activity.[10]

Nor has Ms. Taylor submitted evidence in support of a prima facie case of retaliation

based on the allegation that in June 2002 Mr. Hagans told Ms. Taylor that she needed to improve her

"negative behaviors."  To prove a retaliation claim, Ms. Taylor must show that she suffered from a

retaliatory act that "would have been materially adverse to a reasonable employee," *Burlington*, 126

S. Ct. at 2409, and that "could well dissuade a reasonable worker from making or supporting a charge

of discrimination."  *Id*.  Mr. Hagans' single comment to Ms. Taylor that she should improve her

"negative behaviors" would not dissuade a reasonable employee from making a charge of

discrimination.  This comment was one of "those petty slights or minor annoyances that often take

place at work and that all employees experience." *Id*. at 2415.

In contrast, Ms. Taylor has presented a prima facie case of retaliation based on the

downgrading of her performance evaluation from "outstanding" in 2001 to "excellent" in 2002.  Once

a plaintiff establishes a prima facie case, the burden shifts to the defendant to "articulate some

legitimate, nondiscriminatory reason" for its action.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S.

248, 252-53 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  If the defendant

meets this burden, then the plaintiff must have the opportunity to prove, by a preponderance of the

evidence, that the legitimate reasons offered by the employer were not its true reasons, but were a

"pretext" for discrimination.  *Burdine*, 450 U.S. at 253; *McDonnell Douglas*, 411 U.S. at 804.  PBGC

provides a non-discriminatory explanation for the change in evaluation.  In 2001, Ms. Taylor and

---

[10] Ms. Taylor also alleges that her supervisors started withholding work after she complained about the alleged harassment.  Pl.'s Opp at 18.  Ms. Taylor does not present any evidence whatsoever in support of this allegation.

another auditor, Mike Logan, worked on a special assignment in addition to their regular duties, and

thus they both received an "outstanding" rating on their 2001 evaluations. Def.'s Ex. 14, Henkel First

Aff. at 8-9; Def.'s Ex. 3, Joy Dep. at 91. Also, the rating of "excellent" was consistent with Ms.

Taylor's previous ratings since prior to 2001 she had never received an "outstanding" rating. Her

earlier ratings were as follows:

| Year | Rating |
|------|--------|
| 1996 | meets or exceeds expectations |
| 1997 | excellent |
| 1998 | fully effective |
| 1999 | excellent |
| 2000 | fully effective |

See Def's Reply at 16; Def.'s Ex. 12, Rating Chart. PBGC has presented a legitimate, non-

discriminatory reason for the change in Ms. Taylor's performance rating, and Ms. Taylor has not

presented any evidence of pretext. Ms. Taylor's claim of retaliation must fail.

## IV.  CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment [Dkt. # 26]

will be granted. A memorializing order accompanies this Memorandum Opinion.

Date:  October 19, 2007                                    _____/s/_____

ROSEMARY M. COLLYER
United States District Judge